AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Northern District of California

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | **FILED** |
| ANDRES HINOJOSA MUNOZ | ) | JUL 2 5 2013 |
| | ) | Case No. |
| | ) | **4 - 13 - 70838** |
| | ) | RICHARD W. WIEKING CLERK, U.S. DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA OAKLAND |
| _____ | ) | MAG |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ August 15, 2012 _____ in the county of _____ Contra Costa _____ in the

_____ Northern _____ District of _____ California _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. 841(a)(1), (b)(1)(A)(viii) | Distribution of Methamphetamine |

Approved as to form:

~~~~~~~~~~

AUSA GARTH HIRE

Penalties:
(1) Imprisonment:  Maximum Life, Mandatory Minimum 10 Years
(2) Fine:  Maximum $10,000,000
(3) Supervised Release:  Maximum Life, Mandatory Minimum 5 Years
(4) Special Assessment:  $100

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Mahmood Puktianie
~~Juan Medina~~, DEA Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  7/24/13

_____
*Judge's signature*

City and state:  _____ Oakland, California _____

Hon. Kandis A. Westmore, U.S. Mag. Judge
*Printed name and title*

Document No.
District Court
Criminal Case Processing

1    **AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND SEARCH WARRANT**

2    I, Mahmood Puktianie, being duly sworn, declare as follows:

3    **INTRODUCTION**

4          1.      I am an investigator or law enforcement officer of the United States, within the

5    meaning of 18 U.S.C. § 2510(7), and I am empowered by law to conduct investigations of, and to

6    make arrests for, the offenses enumerated in 18 U.S.C. § 2516.  I am a Special Agent for the United

7    States Department of Justice, Drug Enforcement Administration (DEA), and have been so employed

8    since January 2013.  I am currently assigned to the Oakland Resident Office, High Intensity Drug

9    Trafficking Area (HIDTA) Task Force Group.  Prior to joining the Oakland Resident Office Task

10   Force Group, I received formal training at the DEA Basic Agent Training Academy in Quantico,

11   Virginia.  The formal training I received consisted of comprehensive, formalized instruction in,

12   among other things: basic narcotic investigations, drug identification and detection, interdiction,

13   familiarization with United States narcotics laws, financial investigations and money laundering,

14   identification and seizure of drug related assets, organized crime investigations, physical and

15   electronic surveillance, weapon qualification and tactics, and undercover operations.

16         2.      During the course of my law enforcement career, I have been involved in

17   investigations of numerous criminal offenses, including those offenses related to this current

18   investigation.  I have participated in 10 investigations of illicit drug trafficking organizations, ranging

19   from street level dealers to major dealers.  These investigations have included: the use of confidential

20   informants; the use of undercover agents; the analysis of pen registers, trap and trace, and toll records;

21   physical surveillance; and the execution of search warrants.  These investigations have also included

22   investigating the unlawful importation, possession with intent to distribute, and distribution of

23   controlled substances, the related laundering of monetary instruments, the conducting of monetary

24   transactions involving the proceeds of specified unlawful activities, and conspiracies associated with

25   criminal narcotics offenses.

26         3.      I have worked with approximately 3 informants/cooperators and approximately 2

27   undercover agents and have monitored meetings and consensual telephone conversations with drug

28   dealers involving informants and undercover agents.  I have participated in approximately 65 hours of

surveillance of narcotics traffickers. During these surveillances, I have personally observed narcotics transactions, counter surveillance techniques, and the methods that narcotics traffickers use to conduct clandestine meetings.

4.     I have been involved in the execution of approximately 8 state and federal narcotics-related search warrants. As a result, I have encountered and become familiar with the various tools, methods, trends, paraphernalia, and related articles used by drug traffickers and trafficking organizations in their efforts to import, conceal, manufacture, and distribute controlled substances. I am familiar with the appearance of heroin, cocaine, methamphetamine, marijuana, MDMA, and other controlled substances. I am familiar with and aware of the terminology used by narcotics traffickers concerning narcotics and narcotics dealing.

5.     I have interviewed approximately 7 drug dealers, users, and confidential informants and have discussed with them the lifestyle, appearances, and habits of drug dealers and users, the use and meaning of coded language and the concealment of assets. I have become familiar with the manner in which narcotics traffickers smuggle, transport, store, and distribute narcotics, as well as how they collect and launder drug proceeds. I am also familiar with the manner in which narcotics traffickers use telephones, cellular telephone technology, pagers, coded or slang-filled telephone conversations, false or fictitious identities, and other means to facilitate their illegal activities and thwart law enforcement investigations.

6.     I have also had discussions with other law enforcement officers and cooperating individuals about the packaging and preparation of narcotics, methods of operation, and security measures which are often employed by narcotics traffickers. I have examined documentation of various methods in which illicit drugs are smuggled, transported and distributed. Through these investigations, I have gained expertise in the use of a variety of law enforcement techniques, including the application and utilization of wire and electronic interceptions, the utilization of confidential sources and undercover agents, the use of physical surveillance techniques, and various other types of electronic surveillance techniques, such as body wires and transmitters. Additionally, I have gained knowledge and expertise in the utilization of pen register and trap and trace devices; telephone toll analysis; the analysis of traditional types of records, including financial records,

1  telephone records, and utility records; and non-traditional records, including records routinely

2  maintained by narcotics traffickers listing amounts of drugs delivered and amounts of money owed

3  (pay-and-owe sheets). I have also gained knowledge and expertise in the collection and identification

4  of drug evidence and the analysis and interpretation of taped conversations obtained by the methods

5  detailed above.

6  **PURPOSES OF AFFIDAVIT**

7       **Criminal Complaint and Arrest Warrant**

8       7.    I make this affidavit in support of a criminal complaint and arrest warrant charging

9  Andres Hinojosa MUNOZ (MUNOZ) with distribution of methamphetamine, a Schedule II

10  controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii). MUNOZ was arrested in

11  2009 for possession of a controlled substance and possession/purchase for sale of a controlled

12  substance. On or about December 21, 2012, MUNOZ pleaded no contest to being an accessory in

13  violation of California Penal Code Section 32 and was sentenced to three years' probation.

14  MUNOZ's probation record indicates that his residence is 46 Oceanview Drive, Pittsburg, California

15  94565.

16       **Search Warrant and Location to Be Searched**

17       8.    I also submit this affidavit in support of a warrant to search 46 Oceanview Drive,

18  Pittsburg, California 94565 (SUBJECT PREMISES), which is believed to be the residence of

19  MUNOZ. THE SUBJECT PREMISES appears to be a single-family home. The SUBJECT

20  PREMISES is a one-story, tan structure with brown trim and a black security screen covering a dark

21  colored door. The address number of the SUBJECT PREMISES "46" is posted on the right side of

22  the black security screen covered door. The access route to the SUBJECT PREMISES is a cement

23  walkway located on the east side of the house; this walkway leads from the front of the SUBJECT

24  PREMISES to a cement driveway. The driveway is located on the west side of the SUBJECT

25  PREMISES; this driveway leads from the public street to an attached garage located on the west side

26  of the SUBJECT PREMISES. A grey chain-linked fence is located on the front of the property with a

27  gate that slides open for the driveway. The SUBJECT PREMISES has an elevated front porch with a

28  cement step leading up to the front door. The area to be searched includes the house described above,

including rooms, attics, basements, porches, locked containers and safes, and other parts therein, as

well as the surrounding grounds and driveway, and garages, carports, storage rooms, storage lockers,

trash containers, any vehicles associated with the SUBJECT PREMISES and outbuildings

specifically associated with, or assigned to 46 Oceanview Drive, Pittsburg, California. This

description and photographs of the SUBJECT PREMISES are contained in Attachment A (Location

to be Searched). The items to be seized from the SUBJECT PREMISES are set forth at the end of

this affidavit and in Attachment B (Items to be Seized).

9.      The facts set forth in this affidavit are based on my own personal knowledge,

knowledge obtained from other individuals during my participation in this investigation, including

other law enforcement officers such as DEA SA Juan Medina and DEA SA Jon Christofferson who

have participated in this investigation, my review (or the review of SA Medina and/or SA

Christofferson) of documents and computer records related to this investigation, communications

with others who have personal knowledge of the events and the circumstances described herein

(including de-briefs of cooperating witnesses), my review (or the review of SA Medina and/or SA

Christofferson) of covert audio and/or video recordings of controlled purchases of suspected

narcotics, and information gained through my training and experience. Because this affidavit is

submitted for the limited purpose of establishing probable cause in support of a complaint, it does not

set forth each and every fact that I, or others, have learned during the course of the investigation.

**PROBABLE CAUSE**

10.     On or about the summer of 2012, DEA agents learned of a Hispanic male,

approximately 5'6" tall and 160 pounds with black hair and black eyes by the first name of "Andres"

who was capable of distributing multiple pounds of methamphetamine in the East Bay area.

"Andres" was later identified as Andrés Hinojosa MUNOZ. It was also learned that MUNOZ was

eager to sell methamphetamine in amounts no lower than one-half (1/2) pound quantities.

11.     As a result of this information, a cooperating witness (CW-1) who has been deemed

credible and reliable, was directed to make contact with MUNOZ for the purpose of scheduling a face

to face meeting. The purpose of the meeting was to provide surveillance agents with an opportunity

to fully identify MUNOZ and corroborate the information.

4

12.     CW-1 provided information and services to the DEA during 2012 and received monetary compensation from the DEA in exchange for the information and services. CW-1 has never provided information which was later determined to be unreliable or inaccurate. A criminal background check of CW-1 had revealed an extensive criminal history including arrests in 1994 for transport/sale of a controlled substance; in 1995 for transport/sale of a controlled substance, possession/purchase for sale of a controlled substance, and conspiracy; in 1999 for possession/purchase for sale of a controlled substance; in 2001 for possession/purchase for sale of a controlled substance, violation of parole, and obstruction/resists a public officer, in 2002 for possession/purchase for sale of a controlled substance, and violation of parole; in 2004 for violation of parole and false ID to a specific Police Officer; and in 2008 for possession/purchase for sale of a controlled substance and transport/sell a controlled substance. CW-1 is not currently known to be a defendant for any pending charges. Prior to all controlled purchases of narcotics by CW-1 discussed in this affidavit measures were taken to ensure the integrity of the operation. Specifically, CW-1 was outfitted with at least one covert audio/video and recording device and CW-1's person and vehicle were searched by law enforcement personnel to make sure that CW-1 did not possess any narcotics prior to the purchases from MUNOZ.

**August 1, 2012: Purchase of 26.9 Grams of Actual Methamphetamine from MUNOZ**

13.     On August 1, 2012, CW-1 conducted a controlled purchase of approximately one (1) ounce of suspected methamphetamine from MUNOZ in the Home Depot parking lot located at 2300 North Park Boulevard in Pittsburg, California (Home Depot parking lot). Prior to the arrival of MUNOZ at the Home Depot parking lot, approximately 3 or 4 telephone conversations over telephone number (925) 470-8505 had taken place between MUNOZ and CW-1. According to Sprint-Nextel, the subscriber of the telephone number used by MUNOZ was Jesus Hinojosa with an account billing address of 46 Ocean View Drive, Bay Point, California (SUBJECT PREMISES). The telephone conversations consisted of coordination between MUNOZ and CW-1 in anticipation of the meeting. During the last attempted call, MUNOZ did not answer. However, CW-1 observed a tan, lowered pick-up truck (bearing California license plate 8X41015 and registered to Gerardo Hinojosa

at 46 Ocean View Drive, Pittsburg, California (SUBJECT PREMISES)) which CW-1 recognized as MUNOZ's vehicle.

14.     Moments later, CW-1 observed MUNOZ exit the passenger side of the tan pick-up truck carrying a white Taco Bell cup in his hand. CW-1 then observed MUNOZ enter CW-1's vehicle from the front passenger side with the Taco Bell cup in hand. Once inside of vehicle, MUNOZ handed CW-1 the white Taco Bell cup. CW-1 removed a small clear plastic bag containing a crystal-like substance from within the white Taco Bell cup. CW-1 then provided MUNOZ with $900 as payment for the suspected ounce of methamphetamine. CW-1 observed MUNOZ count the $900 and place it in his front shorts pocket. CW-1 was instructed by MUNOZ to call him when CW-1 was ready to purchase more methamphetamine.

15.     Shortly after the transaction Contra Costa County Sheriff's Office Deputies conducted a traffic stop of MUNOZ's vehicle during which they positively identified the individual who sold methamphetamine to CW-1 as Andres MUNOZ. Deputies subsequently observed the tan pick-up truck park in the driveway of 46 Ocean View Drive, Pittsburg, California (SUBJECT PREMISES).

16.     A DEA Forensic Chemist analyzed the suspected methamphetamine purchased from MUNOZ on August 1, 2012, and determined it to be 27.6 grams of d-methamphetamine hydrochloride (HCL) containing 26.9 grams of actual methamphetamine (a purity of 97.6%).

**August 15, 2012: Purchase of 108.8 Grams of Actual Methamphetamine from MUNOZ**

17.     On August 15, 2012, CW-1 conducted a controlled purchase of approximately four (4) ounces of suspected methamphetamine from MUNOZ in the Home Depot parking lot. CW-1 observed MUNOZ approach CW-1's vehicle on the front passenger side. MUNOZ then asked CW-1 if CW-1 thought the two white vans (located near CW-1's vehicle) appeared suspicious. CW-1 said he/she did not. MUNOZ then entered CW-1's vehicle on the passenger side.

18.     CW-1 observed a bulge inside of MUNOZ's shirt and stated that once inside of CW-1's vehicle, MUNOZ asked for the money. CW-1 informed MUNOZ that the money was in the white and orange Slurpee cup (which contained approximately $3,600) located in between the two front seats. MUNOZ then reached for the cup and at the same time handed CW-1 a clear wrapped package from the bulge inside of MUNOZ's shirt. CW-1 observed MUNOZ count the money. CW-

1 informed MUNOZ that CW-1 was interested in purchasing approximately four ounces or one half

pound of methamphetamine the following next Tuesday or Wednesday.  MUNOZ instructed CW-1 to

call him when CW-1 wanted more methamphetamine.

19.     Following the transaction, surveillance agents observed the tan pick-up truck which

MUNOZ arrived in drive to the area of the SUBJECT PREMISES and the vehicle was later observed

parked in the driveway of the SUBJECT PREMISES.

20.     A DEA Forensic Chemist analyzed the suspected methamphetamine purchased from

MUNOZ on August 15, 2012, and determined it to be 111.2 grams of d-methamphetamine

hydrochloride (HCL) containing 108.8 grams of actual methamphetamine (a purity of 97.9%).

**March 21, 2013:  Purchase of 99.6% Pure Methamphetamine from MUNOZ**

21.     On March 21, 2013, CW-1 and another DEA cooperating witness (CW-2), who has

been deemed credible and reliable, conducted a controlled purchase of approximately one (1) ounce

of suspected methamphetamine from MUNOZ in the Home Depot Parking lot.

22.     CW-2 has provided information and services to the DEA since 2012, and receives

monetary compensation from the DEA in exchange for the information and services.  CW-2 has

never provided information which was later determined to be unreliable or inaccurate.  A criminal

background check of CW-2 shows an extensive criminal history including arrests: in 2007 for

Driving Under the Influence (DUI) Alcohol/Drugs; in 2008 for DUI Alcohol/Drugs 0.08 Percent,

DUI Alcohol/Drugs, Hit and Run: Property Damage, Driving while License Suspended Etcetera; in

2009 for DUI Alcohol/Drugs 0.08 Percent; in 2009 for DUI Alcohol/Drugs, Battery

Spouse/Significant Other (Prosecution Rejected for Lack of Sufficient Evidence), Inflict Corporal

Injury on Child (Prosecution Rejected for Lack of Sufficient Evidence); in 2012 for DUI

Alcohol/Drugs 0.08 Percent.  CW-2 is not currently known to be a defendant for any pending

charges.  Prior to all controlled purchases of narcotics by CW-2 discussed in this affidavit measures

were taken to ensure the integrity of the operation.  Specifically, CW-2 was outfitted with at least one

covert audio/video and recording device and CW-2's person and vehicle were searched by law

enforcement personnel to make sure that CW-2 did not possess any narcotics prior to the purchases

from MUNOZ.

7

23.    Once in the parking lot, both CW-1 and CW-2 observed MUNOZ arrive in a black pick-up truck. CW-2 stated that he/she observed the black pick-up truck park next to the passenger side of CW-1's vehicle. CW-2 observed MUNOZ walk to the bed of the black pick-up truck and retrieve a long and black object before entering the front passenger area of CW-1's vehicle. CW-1 then introduced CW-2 as a friend who wanted to work with MUNOZ. MUNOZ handed CW-2 the long black object CW-2 had previously observed MUNOZ retrieve from the bed of the black pick-up truck. The long black object was a sprinkler head. CW-2 unscrewed the top of the sprinkler head and was told by MUNOZ to be careful because the bag contained within could tear.

24.    MUNOZ informed CW-2 that he also had "soda" (Spanish slang for cocaine) and added that it (cocaine) was perfect for rocks (crack cocaine). CW-1 overheard MUNOZ quote CW-2 a price of $1,200 per ounce of cocaine. CW-2 informed MUNOZ that CW-2 would buy the methamphetamine from MUNOZ as a sample and if CW-2's friend was satisfied with the quality, CW-2 would return to purchase more. CW-2 provided MUNOZ with $800. CW-2 observed MUNOZ count the $800. CW-1 heard MUNOZ inform CW-2 that he had "crystal" and could get as much as CW-2 wanted. CW-1 added that he/she heard MUNOZ explain that he could provide CW-2 with quantities in the amounts of quarter pounds, half pounds or a whole pound. MUNOZ instructed CW-2 to call CW-1 then CW-1 would call MUNOZ. CW-1 informed MUNOZ that it was fine for MUNOZ to provide CW-2 with his telephone number. MUNOZ then provided CW-2 with his telephone number of (925) 759-8271.

25.    On July 23, 2013, I spoke to a DEA Forensic Chemist, who informed me that he had analyzed the suspected methamphetamine purchased from MUNOZ on March 21, 2013, and determined it to be d-methamphetamine hydrochloride (HCL) with a net weight of 27.4 grams and a purity of 99.6%

### April 2013: Purchase of Suspected Methamphetamine from MUNOZ

26.    On April 9, 2013, CW-2 conducted a controlled purchase of approximately four (4) ounces of suspected methamphetamine from MUNOZ in the Home Depot parking lot. During the controlled purchase, MUNOZ provided CW-2 with a sample of cocaine. Prior to the meeting, CW-2 was directed by agents to place a telephone call to MUNOZ at telephone number (925) 759-8271.

During the call, CW-2 was informed by MUNOZ that he wanted to meet in the same location as last time (Home Depot Parking lot) and would arrive within twenty minutes.

27.    Moments after arriving at the Home Depot Parking lot, CW-2 observed MUNOZ arrive in the black pick-up truck and park in the parking space next to the passenger side of CW-2's vehicle. CW-2 observed MUNOZ exit the driver's side of the black pick-up truck and walk to the truck bed. MUNOZ then reached into a bucket in the bed of the black pick-up truck and removed tools from inside of the bucket before removing a clear package.

28.    MUNOZ then entered the passenger side of CW-2's vehicle, greeted CW-2 and handed him/her a clear package with a red strip of tape attached. MUNOZ informed CW-2 that the methamphetamine was good and the cocaine was included. CW-2 informed MUNOZ that he/she did not have the money to pay for the cocaine at this time, but would make up for it the next time CW-2 purchased narcotics from MUNOZ. MUNOZ agreed to allow CW-2 to pay at their next purchase. MUNOZ reminded CW-2 that he required one day's notice prior to the delivery of the narcotics. CW-2 provided MUNOZ with $3,200 as payment for the suspected methamphetamine. CW-2 asked MUNOZ if it was the same price per ounce as last time. MUNOZ agreed. CW-2 asked MUNOZ to count the money. MUNOZ was hesitant to count the money out of concern that there were cameras on the light poles in the parking lot. Shortly after the meet, a CCCSO Deputy observed the black pick-up truck parked in the driveway of 46 Ocean View Drive (SUBJECT PREMISES).

**May 30, 2013:  Purchase of Suspected Methamphetamine from MUNOZ**

29.    On May 30, 2013, CW-2 conducted a controlled purchase of approximately one (1) ounce of suspected methamphetamine and one (1) ounce of suspected cocaine from MUNOZ in the Home Depot parking lot. Prior to the meeting, CW-2 was directed to place an outgoing telephone call to MUNOZ at telephone number (925) 759-8271. During the call, CW-2 confirmed the meet time and location of approximately 4:00 p.m. at the Home Depot parking lot.

30.    Shortly after arriving at the Home Depot parking lot, CW-2 observed MUNOZ arrive in a white Chevy Colorado pick-up truck bearing California license plate 8J58811. At that time the vehicle was registered to individuals apparently unrelated to MUNOZ in Clear Lake, California.

1    However, the current registration information shows that the vehicle is registered to Andres Hinojosa

2    (MUNOZ) at the SUBJECT PREMISES.

3        31.    MUNOZ greeted CW-2 before entering the passenger side of CW-2's vehicle. Upon

4    entering CW-2's vehicle, MUNOZ handed CW-2 a tin foil wrapped object. CW-2 provided MUNOZ

5    with $2,100 as payment for the suspected methamphetamine and suspected cocaine. CW-2 informed

6    MUNOZ that he/she did not have all of the money to pay for the sample MUNOZ provided CW-2

7    during the last meeting. MUNOZ advised CW-2 that he was selling (the cocaine) to CW-2 for

8    $1,200. MUNOZ informed CW-2 that he/she did not owe MUNOZ any further money (for the

9    sample of cocaine).

10       32.    After the meeting, surveillance units followed MUNOZ from the Home Depot parking

11   lot to 46 Ocean View Drive, Pittsburg (SUBJECT PREMISES) and the white pick-up truck was later

12   observed parked in the driveway of the SUBJECT PREMISES.

13       33.    Laboratory analysis and results for the suspected methamphetamine purchased on

14   April 9 and May 30, 2013, have not yet been received.

15   **July 23, 2013: Meeting with MUNOZ Regarding Purchase of Methamphetamine**

16       34.    On July 23, 2013, CW-2 met with MUNOZ at the Home Depot parking lot.

17   According to CW-2, MUNOZ arrived at the location in the Chevy Colorado pick-up truck (which I

18   know to be registered to Andres Hinojosa at the SUBJECT PREMISES). During the meeting CW-2

19   and MUNOZ discussed the purchase of two kilograms of cocaine and one kilogram of

20   methamphetamine. MUNOZ quoted CW-2 a price of $34,000 per kilogram of cocaine and $8,000

21   per pound of methamphetamine. CW-2 showed MUNOZ approximately $60,000 in DEA funds in

22   order to convince MUNOZ that CW-2 could pay for the requested cocaine and methamphetamine.

23       35.    A meeting is scheduled for July 24, 2013, at which point MUNOZ has agreed to

24   provide CW-2 with three pounds of methamphetamine.

25       36.    Based on the facts set forth above, including but not limited to the facts that: (1)

26   MUNOZ has sold large quantities of methamphetamine to CW-1 and CW-2 over the past eleven

27   months; (2) MUNOZ has driven from the location of the drug sales (Home Depot parking lot) to the

28   SUBJECT PREMISES on numerous occasions; (3) and the vehicles used to conduct narcotics

1  transactions are registered at the SUBJECT PREMISES (which is MUNOZ's address of record with

2  probation); as well as my knowledge, training, and experience regarding narcotics trafficking set

3  forth in the next section, I believe that there is probable cause the evidence, fruits, and

4  instrumentalities of narcotics trafficking will be found at the SUBJECT PREMISES. The items to be

5  seized from the SUBJECT PREMISES are also listed below.

6  **KNOWLEDGE, TRAINING, AND EXPERIENCE REGARDING NARCOTICS**

7  **TRAFFICKING**

8     37.    Based upon the facts and circumstances described in the affidavit for a search warrant,

9  along with my training, experience, and consultation with other law enforcement agents experienced

10  in investigations regarding conspiracy to manufacture, distribute, and possess with intent to distribute

11  controlled substances, there is probably cause to believe that the items described in the section below

12  are currently located at the SUBJECT PREMISES. Based upon my training, experience, and

13  consultation with other law enforcement officers, I have learned the following.

14     38.    Drug traffickers and their co-conspirators frequently keep records of their transactions,

15  such as those that would be kept by legitimate business persons engaged in the sale of goods. These

16  drug traffickers and their co-conspirators commonly maintain and retain accounts of records of drug

17  transactions. Such records typically detail the amounts of controlled substances or cash outstanding,

18  funds which are owed or expended; they also tend to indicate and identify buyers, customers, and co-

19  conspirators. Such records may include narcotics or money ledgers, narcotics distribution or customer

20  lists, narcotics supplier lists, correspondence, notation logs, receipts, journals, books, pay and owe

21  sheets; records and other documents noting the types, price, quantity, dated and/or times when

22  narcotics, including names, addresses, phone numbers; documents showing domestic and

23  international travel such as airline tickets, itineraries, passports, and receipts showing travel such as

24  airline receipts, car rental receipts, hotel receipts and fuel receipts. Based upon my training and

25  experience, I know that drug traffickers typically maintain these records on their person and/or at

26  their residences, "safe" or "stash" houses, drug manufacturing locations, drug cultivation sites,

27  storage lockers or facilities, at businesses and/or offices owned by or operated by drug traffickers, or

28  at properties leased or owned by drug traffickers. These records are stored electronically in computers

on hardware or software, on paper, paper writings and records, and electronic storage devices (and their contents) showing evidence of drug trafficking, which include books, ledgers, diaries, address books, lists, notebooks, IOU memos, spreadsheets, rolodexes, telephone bills, telephone answering pads, bank and financial records. Further, drug traffickers often maintain storage facilities associated with the storage of controlled substances and may maintain records and items associated with these storage facilities such as storage locker receipts, safety deposit box rental records and keys.

39.     Narcotics dealers and co-conspirators commonly keep a supply of narcotics on hand for immediate sale. These narcotics are commonly kept on the person, in the home or residence, or in the vehicles of narcotics dealers. Narcotics dealers will often hide their supply of drugs in garages, outbuildings, storage areas, and/or properties leased or owned by narcotics dealers. Larger amounts are often stored in locked security containers to protect the narcotics dealer's investment.

40.     Narcotics dealers often utilize an assortment of equipment to maintain, store, measure, and process their narcotics. This equipment includes: paper bags, baggies, containers, glass and plastic vials, scales, other weighing devices, backpacks, oven turkey bags, plastic storage containers, sifters, packaging items such as plastic wrap, balloons, envelopes, film canisters, condoms, and paper bindles. Items used to prepare controlled substances include otherwise common household items such as pots, pans, mirrors, razors, spoons, electronic hot plates, baking soda, and other cutting and adulteration agents.

41.     Narcotics dealers/traffickers often possess handguns, shotguns, rifles, and other firearms and ammunition, and/or explosive/incendiary devices that may be used to facilitate the distribution or possession of their narcotics. Associated with these weapons, narcotics traffickers also retain documents that indicate the possession, ownership, and acquisition of weapons used/maintained by them and/or their co-conspirators.

42.     Drug traffickers often use various types of communication devices/equipment to facilitate their sales/distribution of narcotics and avoid detection by their illegal activities by law enforcement. Communication devices/equipment used by drug traffickers includes telephones, cellular telephones, telephone paging devices, beepers, car phones, answering machines and associated taped recordings, and other communication devices which could be used to participate in a

12

1   conspiracy to distribute controlled substances in violation of 21 U.S.C. § 846, 841(a). I request
2   authorization to answer and or record any incoming telephone calls at the SUBJECT PREMISES as I
3   believe such calls may be from potential narcotics buyers/customers attempting to place orders for
4   narcotics. I also request authorization to seize answering machines (or to remove and seize the taped
5   recordings from those machines if the calls are on a removable cassette tape). I request authorization
6   to not only seize such telephones, but to search the memory systems of those telephones for evidence
7   of contact with co-conspirators and/or narcotics customers. I believe that the information obtained
8   may constitute evidence of conspiracy to possess and distribute controlled substances.

9          43.   Drug traffickers receive and/or maintain correspondence and records at their
10  residences, properties leased or owned, offices/businesses, and locations of drug manufacturing
11  which identify associates in illegal drug trafficking activities. These records and correspondence
12  include items such as personal telephone and address books, letters, cables, telegrams, telephone bills,
13  photographs, audio and video tapes, personal notes and other items reflecting the names, addresses,
14  telephone numbers, communications, and illegal activities of criminal associates in drug trafficking.
15  These items, as well as keys, utility bills, loan payment receipts, rent documents, canceled envelopes,
16  and personal identification documents, tend to establish the identity of the person(s) having dominion
17  and control over the residence and/or property leased or owned by drug traffickers and as such, over
18  any controlled substances and illicit drug related items found therein.

19         44.   Drug dealers commonly have large sums of money derived from their drug sale
20  profits in violation of 21 U.S.C. §§ 846, 841(a). Drug dealers frequently keep larger sums of
21  cash/currency in locked or security containers and safes. Drug traffickers maintain records of profits
22  derived from their illegal drug trafficking, as well as financial instruments which represent the actual
23  proceeds of illegal drug sales to include: U.S. currency, foreign currency, coins, gold coins, other
24  precious metals, jewelry, bank account receipts, bank account statements, wire transfer records,
25  records of financial transfer, money orders, drafts, checks, traveler's checks, passbooks, cashier's
26  checks, bank checks, bank deposit tickets, certificates of deposit, bonds, stock certificates, letters of
27  credit, credit card bills, safety deposit box records and keys, money wrappers, money bags, money
28

1   containers, income tax returns, money counting machines, and other items evidencing the obtaining,

2   securing, transfer, concealment, and/or expenditure of money.

3       45.    Drug traffickers often own, lease, or otherwise use properties to facilitate drug

4   trafficking including the storage of their narcotics or money derived from their narcotics trafficking.

5   Such properties are often in fictitious names as well as the true names of the narcotics traffickers.

6   Narcotics traffickers often maintain documents, records, and deeds reflecting the purchase, sale, or

7   lease of real estate; as well as vehicles, precious metals, jewelry, or other items obtained with the

8   illegal proceeds of their of narcotics/controlled substances.

9       46.    Drug traffickers maintain records and documents reflecting travel for the purpose of

10  participating in the illegal trafficking of narcotics, including airline tickets, credit card receipts, travel

11  vouchers, gas station receipts, hotel and restaurant receipts, cancelled checks, maps, and written

12  directions to locations.

13      47.    Drug traffickers often use devices to conduct counter surveillance of law enforcement

14  in an attempt conceal their illegal drug trafficking activities from law enforcement detection. These

15  items include radio scanners, police radios, surveillance cameras, mounted surveillance cameras on

16  their residences and "stash houses;" video surveillance monitors and recording devices; and computer

17  monitors which receive video footage from surveillance cameras.

18  **ITEMS TO BE SEIZED**

19      48.    The items to be seized are described in Attachment B, these items include evidence,

20  fruits, and instrumentalities of violations of 21 U.S.C. §§ 846 (conspiracy to distribute, and possess

21  with intent to distribute) and 841(a)(1)(distribution, and possession with intent to distribute a

22  controlled substance), as set forth below:

23      49.    Controlled substances, including substances containing a detectable amount of

24  methamphetamine and or cocaine (regardless of form, i.e., whether wholly or partially pure, diluted in

25  preparation for distribution, or in any preparatory form), and any other controlled substances found

26  on the premises (regardless of form);

27      50.    Equipment and paraphernalia used in the manufacture, sale, distribution, preparation

28  for sale or distribution (e.g., dilution or cutting or use of methamphetamine or cocaine, including

scales measuring devices, balloons, plastic bags, plastic wrap, plastic envelopes, film canisters, and cutting and adulteration agents;

51.     All documents evidencing the manufacture, sale, distribution, or possession of controlled substances, including but not limited to books, ledgers and diaries, address books and lists, buyer and seller lists, notebooks, IOUs, spreadsheets, rolodexes, telephone bills, telephone answering pads, bank and financial records, wire transfer records, evidence of off-site storage (such as storage locker receipts and safety deposit box rental records and keys), documents reflecting domestic and international travel such as airline tickets, itineraries, and passports), and receipts showing travel (such as airline receipts, car rental receipts, hotel receipts, and fuel receipts);

52.     Currency derived from the sale of controlled substances in violation of 21 U.S.C. §§ 841 and 846, and money wrappers, rubber bands, money containers, and money counting machines;

53.     Financial instruments purchased with large amounts of currency derived from the sale of controlled substances, including travelers checks, bonds, stock certificates, cashiers checks, certificates of deposit, and money orders;

54.     Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry or other items obtained with the proceeds of the sales of controlled substances;

55.     Vehicles, precious metals, jewelry, and/or other items obtained with the proceeds of the sales of controlled substances;

56.     Any boxes, bags, briefcases, suitcase or containers used to carry controlled substances;

57.     All firearms, ammunition, and other items relating to the possession, maintenance and use of firearms, including ammunition magazines, speed loaders, ballistic vests, spare firearms parts, holsters, cleaning kits, and all other documentation which relates to the possession, sale or transfer of firearms, including but not limited to photographs, receipts for the purchase or repair of firearms, firearm containers, carrying cases, and firearm boxes;

58.     Documents, items, and indicia tending to establish the identity of persons in control of the premises and/or things described in this warrant, including but not limited to utility bills, rent receipts, cancelled checks, bank and other financial statements and records, deposit receipts,

1    passports, driver's licenses, social security cards, mail, and other identification documents, land and

2    lease titles, escrow papers, photographs, video and audio records, and keys;

3          59.    Devices or media that store data electronically, including personal computers, desktop

4    computers, laptop computers, tablet computers, personal digital assistants ("PDAs"); mobile

5    telephones, pagers and answering machines (collectively, "Electronic Devices") that could contain

6    evidence of the manufacture or distribution of controlled substances or participation in a conspiracy

7    to manufacture, distribute, and/or possess with intent to distribute controlled substances in violation

8    of 21 U.S.C. §§ 846 and 841(a)(1), or use of such devices in violation of 21 U.S.C. §843(b):

9                 a.   Names and contact information of individuals who may be engaged in

10    narcotics trafficking contained in any Electronic Device;

11                 b.   Logs of calls (which would include last numbers dialed, last calls received,

12    time of calls and duration of calls) both to and from an Electronic Device;

13                 c.   Text messages both sent to and received from an Electronic Device relating to

14    or referencing narcotics trafficking and/or referencing individuals engaged in narcotics trafficking;

15                 d.   Incoming and outgoing voice mail messages both to and from an Electronic

16    Device relating to or referencing narcotics trafficking or individuals engaged in narcotics trafficking;

17                 e.   Browser messages and/or internet communications (e.g., e-mail; text messages)

18    both to and from an Electronic Device relating to or referencing narcotics trafficking or individuals

19    engaged in narcotics trafficking; and

20                 f.   All documents in electronic format relating to or referencing narcotics

21    trafficking and/or individuals engaged in narcotics trafficking.

22          **Background Regarding Computers, the Internet, and E-mail**

23          60.    The term "computer" as used herein is defined in 18 U.S.C. § 1030(e)(1), and includes

24    an electronic, magnetic, optical, electrochemical, or other high speed data processing device

25    performing logical, arithmetic, or storage functions, and includes any data storage facility or

26    communications facility directly related to or operating in conjunction with such device.

27          61.    Based upon my training, experience, and consultation with other law enforcement

28    officers, I have learned the following:

62.     The Internet is a worldwide network of computer systems operated by governmental entities, corporations, and universities.  In order to access the Internet, an individual computer user must subscribe to an access provider, which operates a host computer system with direct access to the Internet.  The world wide web ("www") is a functionality of the Internet which allows users of the Internet to share information;

63.     Internet Service Providers ("ISPs"): Most individuals and businesses obtain access to the Internet through businesses known as Internet Service Providers ("ISPs");

64.     With a computer connected to the Internet, an individual computer user can make electronic contact with millions of computers around the world.  This connection can be made by any number of means, including modem, local area network, wireless and numerous other methods;

65.     Internet Protocol Address ("IP address"): An Internet Protocol address is a unique numeric address used to identify computers on the Internet.  The standard format for IP addressing consists of four numbers between 0 and 255 separated by dots (e.g., 149.101.10.40). Every computer connected to the Internet (or group of computers using the same account to access the Internet) must be assigned an IP address so that Internet traffic sent from and directed to that computer is directed properly from its source to its destination. Internet service providers ("ISPs") assign IP addresses to their customers' computers.  An ISP might assign a different IP address to a customer each time the customer makes an Internet connection (so-called "dynamic IP addressing"), or it might assign an IP address to a customer permanently or for a fixed period of time (so-called "static IP addressing"). The IP address used by a computer attached to the Internet is unique for the duration of a particular session; that is, from connection to disconnection. ISP's typically log their customers' connections, which means that the ISP can identify which of their customers was assigned a specific IP address during a particular session;

66.     E-mail is a popular form of transmitting messages and/or files in an electronic environment between computer users.  A server is a computer that is attached to a dedicated network and serves many users.  An e-mail server may allow users to post and read messages and to communicate via electronic means.  When an individual computer user sends e-mail, it is initiated at

1   the user's computer, transmitted to the subscriber's mail server, then transmitted to its final

2   destination;

3       67.     Any e-mail that is sent to a subscriber is stored in the subscriber's "mail box" on the

4   provider's servers until the subscriber deletes the e-mail or the subscriber's mailbox exceeds the

5   storage limits preset by the e-mail provider.  If the message is not deleted by the subscriber, the

6   account is below the maximum limit, and the subscriber accesses the account periodically, that

7   message can remain on the provider's servers indefinitely;

8       68.     When the subscriber sends an e-mail, it is initiated at the user's computer, transferred

9   via the Internet to the servers of the e-mail provider, and then transmitted to its end destination. Users

10  have the option of saving a copy of the e-mail sent.  Unless the user specifically deletes the e-mail

11  from the e-mail account, the e-mail can remain on the system indefinitely.  The sender can delete the

12  stored e-mail message thereby eliminating it from the e-mail box maintained at the e-mail provider,

13  but that message will remain in the recipient's e-mail box unless the recipient deletes it as well or

14  unless the recipient's account is subject to account size limitations;

15      69.     A subscriber can store files, including e-mails and image files, on servers maintained

16  and/or owned by the e-mail provider;

17      70.     E-mails and image files stored on an e-mail provider server by a subscriber may not

18  necessarily be located in the subscriber's home computer.  The subscriber may store e-mails and/or

19  other files on the provider's server for which there is insufficient storage space in the subscriber's

20  computer and/or which he/she does not wish to maintain in the computer in his/her residence.  A

21  search of the files in the computer in the subscriber's residence will not necessarily uncover the files

22  that the subscriber has stored on the e-mail provider's server;

23      71.     Data that is processed by a computer may be written to the computer's internal hard

24  drive or other storage medium even if the user does not intentionally save the information. Other

25  storage medium may include compact discs (CDs), digital video disks (DVDs), floppy diskettes,

26  thumb drives, pocket hard drives, external hard drives and flash drives. For example, a computer

27  operating system may take random data out of working memory and use it to "pad" files on a

28  computer hard drive during the storage process;

72.     Electronic information can remain on computer storage media, such as internal and external hard drives, pocket drives, thumb drives, CDs, DVDs, diskettes, and flash drives, for an indefinite period of time. Even when a computer user attempts to delete records from a computer storage medium, the records may still exist and be recovered through computer forensic techniques; and

73.     Computer files may be easily moved from computer to computer, using direct wire connections or through the use of storage media such as floppy diskettes, CDs, DVDs, diskettes, thumb drives, pocket drives, flash drives and USB drives.

### Specifics of Searches and Seizures of Computer Systems

74.     Based upon my training and experience and on information related to me by Agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices including hard disk drives, external drives, floppy discs, compact disks, digital video disks, magnetic tapes, and memory chips. I also know that during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

75.     Searching computer systems is a highly technical process, which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software application, or operating system that is being searched.

76.     Searching computer systems for the evidence described in Attachment B may require a range of data analysis techniques. In some cases, it may be possible for the search team to conduct carefully targeted searches that can locate evidence without requiring a time consuming manual search through unrelated materials that may be comingled with criminal evidence. For example, the search team may be able to execute a "keyword" search that searches through the files stored in a computer for special words that are likely to appear only in the materials covered by a warrant. Similarly, the search team may be able to locate the materials covered in the warrant by looking for

19

particular directory or file names. In other cases, however, such techniques may not yield the evidence described in the warrant. Computer users can mislabel or hide files and directories; encode communications to avoid using key words; attempt to delete files to evade detection; or take other steps designed to thwart law enforcement searches for information. These steps may require the search team to conduct more extensive searches, such as scanning areas of the disk not allocated to listed files, or opening every file and scanning its contents briefly to determine whether it falls within the scope of the warrant.

77. Searching computer systems requires the use of precise, scientific procedures, which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data are particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted.

78. The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises. A singly megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing fifteen gigabytes of data are now commonplace in desktop computers. Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 7.5 million pages of data, which if printed out, would completely fill a 10' x 12' x 10' room to the ceiling.

79. Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard" is necessary to decrypt the data into readable

1    form. Computer users also can conceal data within another seemingly unrelated and innocuous file in

2    a process called "steganography." For example, by using steganography, a computer user can conceal

3    text in an image file, which cannot be viewed when the image file is opened. Therefore, a substantial

4    amount of time is necessary to extract and sort through data that is concealed or encrypted to

5    determine whether it is evidence, contraband, or instrumentalities of a crime.

6    **CONCLUSION**

7        80.     Based on the above, I believe there is probable cause to believe that MUNOZ

8    distributed methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) and I respectfully

9    request that the Court sign the requested criminal complaint and issue the requested arrest warrant.  I

10   also believe that there is probable cause that the SUBJECT PREMISES contains evidence, fruits and

11   instrumentalities of narcotics trafficking offenses, specifically, possession with intent to distribute

12   controlled substances and conspiracy to distribute, and possess with intent to distribute, controlled

13   substances, in violation of 21 U.S.C. §§ 841(a)(1) and 846 and I respectfully request that the Court

14   issue a warrant to search the SUBJECT PREMISES.

15

16

17                                             Special Agent Mahmood Puktianie
                                               Drug Enforcement Administration
18

19   Subscribed to and sworn before me
     this 24th day of July, 2013.
20

21

22

23   HONORABLE KANDIS A. WESTMORE
     UNITED STATES MAGISTRATE JUDGE
24

25

26

27

28

                                    21